**Affirmed and Memorandum Opinion filed May 14, 2019.**



In The

# Fourteenth Court of Appeals

## NO. 14-18-01088-CV

## IN THE INTEREST OF A.D.M., A CHILD

**On Appeal from the 314th District Court
Harris County, Texas
Trial Court Cause No. 2017-04361J**

## M E M O R A N D U M    O P I N I O N

This accelerated appeal arises from a final decree in a suit in which termination of the parent-child relationship was at issue. *See* Tex. Fam. Code Ann. § 109.002(a-1). The child is Anna. The parents are B.C.J.-M. (Mother) and J.D.M. (Father).[1] The trial court terminated both parents' rights and appointed the Texas Department of Family and Protective Services (the Department) to be Anna's managing conservator. Only Mother appeals.

On appeal, Mother challenges the sufficiency of the evidence to support

---

[1] We use pseudonyms or initials to refer to the children, parents, and other family members involved in this case. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

termination. We conclude legally and factually sufficient evidence supports the trial court's findings that (1) Mother had a parent-child relationship terminated with respect to another child based on a finding that Mother's conduct endangered that child; and (2) termination of Mother's parental rights is in Anna's best interest. Therefore, we affirm the trial court's decree.

## BACKGROUND

### A. Removal

Both Mother and Anna tested positive for cocaine when Anna was born in September 2017 at 34 weeks' gestation. This case arises out of the referral the Department received regarding those drug test results.

Mother has two older children: Maya, who was a teenager when Anna was born, and Andrew, who was four years old and already under Department care. Due to the pending case about Andrew, the Department knew Mother and Father both abused drugs and had a history of domestic violence, with Mother as the aggressor. The Department believed neither Mother, Father, nor any family member could protect Anna. Mother and Father did not identify possible placements when asked.

The Department formally removed Anna from her parents' care when she was five days old and filed this suit the same day. Following a full adversary hearing, the trial court signed an order requiring Mother to comply with any family service plan created for her by the Department. The service plan would identify the goals she needed to achieve and tasks and services she needed to complete before Anna could be placed in her care.

### B. Trial

Trial was held at the end of October 2018. The testifying witnesses relevant to this appeal were Department caseworker Sabrina Blaylock, Court Appointed

Special Advocate (CASA) Barbara Brennen, Mother, and Anna's paternal grandmother.

### 1. Evidence about Mother

#### a. Drug abuse

The record contains drug test results for Mother dating back to September 2013, just over five years before trial. From that time through February 2014, Mother tested negative.

The next results in the record are from December 2016, at which time she tested positive for cocaine, cocaine metabolite, and marijuana metabolite. No evidence was offered to interpret her test results, though testimony from Blaylock suggests her levels were high.[2] Two months later, she again tested positive for cocaine, cocaine metabolite, and marijuana metabolite, as well as marijuana and methamphetamines.[3] She failed to appear for her tests in April 2017 and July 2017; her failures to appear are considered positive results under Department policy.

Mother was not tested again until she gave birth to Anna in September 2017. Medical records state both she and Anna tested positive on a cocaine screen but further testing would be necessary. Mother reportedly admitted to a Department caseworker that she would be positive for marijuana if tested.

Mother missed another scheduled drug test when Anna was nearly a month old. Three weeks later, Mother tested positive for cocaine, cocaine metabolite,

---

[2] Cocaine: greater than 20,000 picograms per microgram (pg/mg) in her hair; benzoylecgonine (a cocaine metabolite): 161,824 nanograms per milliliter (ng/mL) in her urine and 12,360 pg/mg in her hair; norcococaine (a cocaine metabolite): 3,811 pg/mg in her hair; marijuana metabolite: 121 ng/mL in her urine and 1.9 pg/mg in her hair.

[3] Cocaine: greater than 20,000 pg/mg in her hair; benzoylecgonine: 86,478 ng/mL in her urine and 19,706 pg/mg in her hair; marijuana: 48.04 pg/mg in her hair; marijuana metabolite: 0.71 ng/mL in her urine; methamphetamine: 1,169 pg/mg in her hair.

marijuana metabolite, and methamphetamine.[4]

Mother admitted at trial that she previously had a drug problem but insisted she was sober and committed to remaining sober.

### b.    Criminal history

The record contains 12 judgments of conviction, though Mother admitted to being arrested "18 [or] 19" times. Her criminal history in the record began in 2006. Early that year, she pleaded guilty to possession of less than one gram of cocaine. The criminal court deferred adjudication and placed her on community supervision for two years. Just six months later, the court adjudicated her guilty because she violated the terms of her community supervision by engaging in illegal activity— specifically, prostitution and failing to identify herself to a police officer. She was sentenced to nine months' confinement in jail for the possession charge and 10 days' confinement each for prostitution and failure to identify herself. About a year later, she pleaded guilty to criminal trespass. She was sentenced to serve 15 days in jail.

No further criminal activity is noted until the spring of 2009, when she followed the same pattern she had in 2006. She pleaded guilty to possession of less than one gram of cocaine, was placed on deferred adjudication community supervision for two years, violated her community supervision a year later, and was adjudicated guilty and sentenced to eight months' incarceration. Between May 2010 and December 2011, she pleaded guilty four times to prostitution; her sentences ranged from 30 days to one year in jail. A criminal court sentenced her to 30 days' confinement for possession of zero to two ounces of marijuana in May 2011.

Mother appeared to refrain from criminal activity until the summer of 2017,

---

[4] Cocaine: greater than 20,000 pg/mg in her hair; benzoylecgonine: 17,488 ng/mL in her urine and greater than 20,000 pg/mg in her hair; norcococaine: 7,129 pg/mg in her hair; marijuana metabolite: 0.3 pg/mg in her hair; methamphetamine: 2,281 pg/mg in her hair.

at which time she allegedly assaulted Father. She pleaded guilty and was sentenced to serve 30 days in jail. In August 2018, just 10 weeks before trial in this case, she was arrested for delivery of between one and four grams of cocaine. Mother again pleaded guilty and was sentenced to 90 days' confinement.

### c.  Department history

Mother's history with the Department reportedly began in 2013. We presume that investigation involved Maya, because Andrew was not born until 2014. Mother completed the services the Department requested in connection with that case.

The Department received another referral about Mother when Andrew was born in April 2014. She and Andrew both tested positive for marijuana at his birth. From the time Andrew was 18 months to two and a half years old, Mother was reported three times to the Department. The first referral alleged neglectful supervision due to Mother's physical assault of Father while Father was holding Andrew. The Department could not contact the parents; relatives allegedly told the investigator that Mother and Father were actively avoiding the Department. The second referral, made shortly after Andrew turned two, alleged physical abuse and was ruled out. The third referral again alleged neglectful supervision of Andrew due to Mother's ongoing drug use and her irresponsible behavior of prostitution and assault. The Department found reason to believe the allegations in the third referral.

The Department filed suit for termination, protection, and conservatorship regarding Andrew in January 2017. Following a bench trial in January 2018, the trial court terminated the parent-child relationship between Mother and Andrew on several bases. The bases relevant to this appeal were subsections E (endangerment) and N (constructive abandonment) of section 161.001(b)(1) of the Family Code. The decree for termination, a certified copy of which was admitted into evidence and is included in the appellate record, states in relevant part:

5

[T]he Court findings by clear and convincing evidence that [Mother] has:

engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child, pursuant to § 161.001(b)(1)(E), Texas Family Code;

constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months and: (1) the Department or authorized agency has made reasonable efforts to return the child to [Mother]; (2) [Mother] has not regularly visited or maintained significant contact with the child; and (3) [Mother] has demonstrated an inability to provide the child with a safe environment, pursuant to § 161.001(b)(1)(N), Texas Family Code.

Blaylock testified Mother's parental rights with respect to Maya were terminated in May 2018. No further information about that termination appears in the record.[5]

### d.    Service plan

Mother's service plan required her to, among other things: refrain from engaging in illegal activities; complete a substance abuse assessment; submit to random drug testing and test negative; participate in a 12-step program for substance abuse; participate fully in a psychosocial evaluation and follow all recommendations by the evaluator; actively participate in parenting classes; obtain, maintain for more than six months, and provide documentation of employment and stable housing; and attend all hearings, meetings, and visits with Anna.

Mother could not be located until early January 2018. At that time, Brennen personally gave Mother and Father their family service plans. Blaylock arranged to meet with the parents the next day at their home. When she arrived, nobody answered the door. Blaylock testified the Department went to the home monthly

---

[5] There is no suggestion either previous termination was appealed or reversed on appeal.

thereafter. Some months the parents would answer the door and talk about their service plan. Other months, Blaylock said, they would say, "[D]on't ask us about services. We don't want to talk about services. We don't want to do services." Brennen agreed Mother had made clear she was not interested in doing her services.

Blaylock testified Mother did not begin any of the services on the service plan, nor did she pay child support. Mother said she did not undertake her services because she could not afford them. She said the Department told her they would not pay for her services in this case because it paid for them previously. Mother insisted she would have completed the required services if she could have afforded them. She also said she had a job "lined up."

### e. Willingness and ability to parent

Mother was largely absent following Anna's removal. Blaylock testified the Department tried repeatedly to contact Mother after Anna was removed, even going so far as to have law enforcement attempt to serve Mother with process. The return of service indicates the process server went to three residences on three days trying to find Mother but was unsuccessful. Mother finally had to be served by publication.

Mother acknowledged her contact with the Department had been "sporadic." She also admitted trial was her first court appearance in this case.

### 2. Evidence about Anna

Thirteen months old at the time of trial, Anna was placed with a paternal cousin. Her paternal grandmother had suggested that placement to the Department. Blaylock testified the cousin was meeting all of Anna's needs and confirmed Anna has no special needs. Anna was said to be extremely bonded with the three people who lived in that home: the cousin, the cousin's sister, and the cousin's nephew. Blaylock described the home as "loving" and said Anna is "doing amazing and

thriving" in that home.

Blaylock and Brennen agreed termination of Mother's parental rights is in Anna's best interest because Mother has not alleviated the concerns that brought Anna into Department care. Blaylock cited Mother's extensive criminal and Department histories, her continuous drug abuse, and her lack of interest in participating in any of the services designed to improve her parenting skills. Mother agreed Anna should remain with the cousin but asked the trial court not to terminate her parental rights. Blaylock believed termination of Mother's rights was best for Anna because Anna needs permanency and the cousin needs financial support for Anna she cannot obtain if Mother's rights are not terminated.

### 3. Trial court's findings

The trial court found the Department had proved the requirements of subsection M of Family Code section 161.001(b)(1). The court additionally found termination of Mother's parental rights was in Anna's best interest. The trial court appointed the Department to be Anna's managing conservator.

### ANALYSIS

## I. Burden of proof and standards of review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *In re J.E.M.M.*, 532 S.W.3d 874, 879 (Tex. App.—Houston [14th Dist.] 2017, no pet.). However, the child's emotional and physical interests must not be sacrificed to preserve parental rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Parental rights may be terminated if clear and convincing evidence shows (1) the parent committed an act described in section 161.001(b)(1) of the Family Code, and (2) termination is in the best interest of the child. Tex. Fam. Code Ann.

8

§ 161.001(b)(1), (2). Only one predicate finding under section 161.001(b)(1), along with the best-interest determination, is necessary to support termination. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007. This high burden reflects the severity of termination.

The heightened burden of proof results in heightened standards of review for evidentiary sufficiency:

- *Legal sufficiency.* We consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could disbelieve. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

- *Factual sufficiency.* We consider and weigh all the evidence, including disputed or conflicting evidence, to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. We consider whether disputed evidence is such that a reasonable fact finder could not have resolved that dispute in favor of its finding. *C.H.*, 89 S.W.3d at 25.

The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam). We may not second-guess the fact finder's resolution of a factual dispute by relying on disputed evidence or evidence the fact finder "could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

## II.  Predicate ground for termination: Previous termination based on endangerment (161.001(b)(1)(M))

Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding under Family Code section 161.001(b)(1)(M).

If termination is in the best interest of the child, the parent-child relationship may be terminated if the trial court finds by clear and convincing evidence that the parent has "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(M). Mother's parental rights to Andrew were terminated based on, among other things, a finding that her conduct violated subsection E. The termination decree was admitted into evidence and is included in the appellate record.

Mother makes the following argument on appeal:

Arguably, [the previous termination] should not have happened because the Mother has proved herself to be capable of completing services. Mother successfully completed her [family service plan] in 2013. The Department expressed their refusal to pay for services again for the Mother, even though she is currently unemployed and indigent.

A rational trier of fact can see that the Mother has unfortunate circumstances and should be compassionate with the Mother. A rational trier of fact would order the Department to provide funds for the Mother to complete her services and assist her with her unemployment issues.

Respectfully, the court reasonably should have given proper weight to the Mother's circumstances and limitations. Therefore, termination as to M ground is not supported under these facts.

The evidence of Mother's "unfortunate circumstances" and limitations are relevant to the question of whether termination is in Anna's best interest. Mother offers no authority to suggest they are relevant to subsection M.

We conclude the evidence is legally and factually sufficient to support the trial court's predicate finding. We overrule Mother's first issue.

## III. Best interest

Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of parental rights is in Anna's best interest.

### A. Legal standards

Termination must be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(2). Texas courts presume two conditions to be in a child's best interest: (1) prompt, permanent placement in a safe environment, *id.* § 263.307(a); and (2) remaining with the child's natural parent. *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). The best-interest analysis focuses on the child, not the parent. *In re K-A.B.M.*, 551 S.W.3d 275, 287 (Tex. App.—El Paso 2018, no pet.).

Courts may consider these non-exclusive factors, known as the *Holley* factors, in its best-interest analysis: the desires of the child; the physical and emotional needs of the child now and in the future; the physical and emotional danger to the child now and in the future; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This list of factors is not exhaustive, and evidence is not required on all the factors to support a finding that termination is in the child's best interest. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). The Family Code also identifies factors the court may consider in evaluating a parent's willingness and ability to provide the child with a safe environment. Tex. Fam. Code Ann. § 263.307(b). Finally, evidence supporting the statutory predicate

of termination is relevant to the best-interest analysis. *S.R.*, 452 S.W.3d at 366.

**B. Application**

**1. Anna**

**a. Anna's desires and needs**

When a child is too young to express his desires, the fact finder may consider that the child has bonded with the foster family, is well cared for by them, and has spent minimal time with a parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.–Houston [14th Dist.] 2014, no pet.). Only thirteen months old at the time of trial, Anna could not express her desires. The trial court could consider the undisputed evidence that (1) Anna is extremely bonded with her caregiver and the other people in her home, (2) Anna is well cared for by the caregiver, and (3) Anna has never lived with Mother.

**b. Stability of proposed placement**

Blaylock testified the cousin's home is stable and loving. The cousin was meeting all of Anna's needs.

**2. Mother**

**a. Endangerment**

*Legal standards.* "To endanger" a child means to expose him to loss or injury or to jeopardize his emotional or physical health. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "Conduct" includes acts and failures to act. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Endangerment contemplates a voluntary, deliberate, and conscious course of conduct by the parent. *S.R.*, 452 S.W.3d at 361. A court properly may consider actions and inactions

occurring both before and after a child's birth to establish a "course of conduct." *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.). While endangerment often involves physical endangerment, the conduct need not be directed at a child, nor must the child actually suffer injury. Rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re A.L.H.*, 515 S.W.3d 60, 92 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

A parent's continuing substance abuse can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *L.G.R.*, 498 S.W.3d at 204. A parent's drug use exposes the child to the possibility the parent may be impaired or imprisoned and, thus, unable to take care of the child. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct. *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253–54 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc). The fact finder may give "great weight" to the "significant factor" of drug-related conduct. *L.G.R.*, 498 S.W.3d at 204.

A parent's criminal conduct and imprisonment are relevant to the question of whether the parent engaged in a course of conduct that endangered the well-being of the child. *S.R.*, 452 S.W.3d at 360–61; *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712–13 (Tex. App.—El Paso 2012, no pet.). Imprisonment

alone is not an endangering course of conduct but is a fact properly considered on the endangerment issue. *Boyd*, 727 S.W.2d at 533–34. Routinely subjecting a child to the probability she will be left alone because her parent is in jail endangers the child's physical and emotional well-being. *S.M.*, 389 S.W.3d at 492.

*Drug abuse.* Mother has used drugs for years, both before and after her children were born and during her pregnancy with Anna. A mother's use of drugs during pregnancy may be conduct that endangers the child. *In re A.S.*, 261 S.W.3d 76, 86 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

Mother insisted she was sober at the time of trial and committed to her sobriety. The trial court was free to discredit her self-serving testimony. *See H.R.M.*, 209 S.W.3d at 109 (fact finder is sole arbiter when assessing credibility and demeanor of witnesses). In any event, substance abuse is "hard to escape," and the fact finder is "not required to ignore a long history of dependency . . . merely because it abates as trial approaches." *In re M.G.D.*, 108 S.W.3d 508, 513–14 (Tex. App.— Houston [14th Dist.] 2003, pet. denied). The trial court may reasonably decide a parent's changes before trial are too late to impact the best-interest decision. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied). Although a reasonable fact finder could look at Mother's claimed sobriety and decide it justified the risk of keeping her as a parent, we cannot say the trial court acted unreasonably in finding Anna's best interest lay elsewhere. *M.G.D.*, 108 S.W.3d at 514. It is not our role to reweigh the evidence on appeal, and we may not substitute our judgment of Anna's best interest for the considered judgment of the fact finder. *See id.* at 531 (Frost, J., concurring in judgment).

*Criminal activity.* Mother's criminal history is long. She has been convicted at least 12 times, mostly for prostitution and drug-related offenses. One such offense

occurred just 10 weeks before trial. She pleaded guilty to assaulting Father, and the record suggests she committed other acts of domestic violence against him for which she was not held criminally responsible.

### b. Service plan

Mother did not begin any of the services required by her court-ordered family service plan. Blaylock and the CASA testified Mother indicated, through words and action, that she was not interested in taking advantage of those services. Mother contended at trial she failed to complete her services only because she could not afford to pay for them. Again, the trial court was free to discredit her self-serving testimony. *H.R.M.*, 209 S.W.3d at 109. We may not second-guess the trial court's resolution of a factual dispute by relying on disputed evidence or evidence the fact finder "could easily have rejected as not credible." *L.M.I.*, 119 S.W.3d at 712.

### c. Willingness and ability to parent

The evidence supports an inference that Mother actively avoided the Department in this case despite knowing her parental rights with respect to Anna could be terminated. Further, the trial court in Mother's case regarding Andrew found she constructively abandoned Andrew. That finding is evidence that Mother is unwilling to parent her children.

### d. Programs available

There is no evidence about specific programs available to assist Mother in parenting Anna.

### e. Acts or omissions and any excuses for them

As stated above, Mother contended she would have completed her services had she been able to afford to pay for them. She offered no excuse for her drug abuse or criminal activity.

15

## C.    Conclusion

Applying the applicable standards of review, we conclude the evidence is legally and factually sufficient to support the trial court's best-interest finding. We overrule Mother's second issue.

## CONCLUSION

We affirm the trial court's final decree.

/s/    Tracy Christopher
Justice

Panel consists of Justices Christopher, Bourliot, and Zimmerer.